# Effect of a Repeal of the Tonkin Gulf Resolution

Because the President's inherent constitutional authority to employ military force abroad depends to a very considerable extent on the circumstances of the case, and, in particular, the extent to which such use of force is deemed essential for the preservation of American lives and property or the protection of American security interests, it is impossible to state in concrete terms the legal effect of a repeal of the Tonkin Gulf Resolution.

Such a repeal standing alone would not only throw into question the legal basis for certain actions the President might deem it desirable to take in the national interest, but would also demonstrate to foreign powers lack of firm national support for the carrying out of the policies set forth in the joint resolutions.

January 15, 1970

MEMORANDUM FOR THE DIRECTOR
BUREAU OF THE BUDGET

This is in response to your request for the views of the Department of Justice on S.J. Res. 166, to repeal legislation relating to the use of the armed forces of the United States in certain areas outside the United States and to express the sense of the Congress on certain matters relating to the war in Vietnam, and for other purposes.

Section 1 of S.J. Res. 166 would repeal four joint resolutions which have specifically or impliedly authorized the use of the armed forces at the discretion of the President in circumstances not involving a declaration of war by the United States:

1. The joint resolution of January 29, 1955, Pub. L. No. 84-4, 69 Stat. 7, which authorizes the President "to employ the Armed Forces of the United States as he deems necessary for the specific purpose of securing and protecting Formosa and the Pescadores against armed attack."

2. The joint resolution of March 9, 1957, Pub. L. No. 85-7, 71 Stat. 5, "[t]o promote peace and stability in the Middle East." This resolution authorizes the President to undertake military assistance programs in the general area of the Middle East and states further that "if the President determines the necessity thereof, the United States is prepared to use armed forces to assist" any Middle Eastern nation or group of nations "against armed aggression from any country controlled by international communism." *Id.* § 2. (S.J. Res. 166 would repeal only section 2 of the joint resolution; however, the other provisions of the resolution have either been executed or depend for their effect on the continued effectiveness of section 2.)

3. The joint resolution of October 3, 1962, Pub. L. No. 87-733, 76 Stat. 697, "expressing the determination of the United States with respect to the situation in Cuba."

4. The joint resolution of August 10, 1964, the "Tonkin Gulf Resolution," Pub. L. No. 88-408, 78 Stat. 384, which "approves and supports the determination of

the President, as Commander in Chief, to take all necessary measures to repel any armed attack against the forces of the United States and to prevent further aggression," *id.*, and states further that the United States is prepared, "as the President determines, to take all necessary steps, including the use of armed force, to assist any member or protocol state of the Southeast Asia Collective Defense Treaty requesting assistance in defense of its freedom," *id.* § 2.

It should be noted that the repeal would not be effective upon the enactment of S.J. Res. 166, but upon the sine die adjournment of the 91st Congress.

The proposal to repeal these various statements of policy and grants of authority raises the question what would be the President's authority to use the armed forces in the absence of the legal support provided by these resolutions. No simple answer can be given. While the Constitution reserves to Congress the authority to declare war, Presidents have frequently employed military and naval forces abroad in the absence of a declaration of war, sometimes with and sometimes without an expression of congressional approval such as those contained in the joint resolutions listed above. To cite a few examples, President Truman's action in sending American troops to Korea in 1950 and President Johnson's action in sending troops to the Dominican Republic in 1965 were taken without the benefit of any specific congressional grant of authority. On the other hand, the authority to conduct the Vietnam War derives, at least in part, from the Tonkin Gulf Resolution. President Eisenhower's action in landing troops in Lebanon in 1958 was not explicitly based on the joint resolution of March 9, 1957, but the existence of the resolution undoubtedly strengthened the legal and political case for such action.

Presidents have traditionally sought this sort of congressional authority not only to avoid legal questions in a somewhat shadowy area of constitutional law, but also to demonstrate to present and prospective antagonists the American people's unity of purpose. Thus, in requesting from Congress a resolution regarding the defense of Formosa, President Eisenhower stated that authority for some of the actions he might find it necessary to take would be "inherent in the authority of the Commander-in-Chief," and that he would not hesitate, in the absence of authority from Congress, to take emergency action "to protect the rights and security of the United States." Special Message to the Congress Regarding United States Policy for the Defense of Formosa, *Pub. Papers of Pres. Dwight D. Eisenhower* 207, 209, 210 (Jan. 24, 1955). He added:

> However, a suitable Congressional resolution would clearly and publicly establish the authority of the President as Commander-in-Chief to employ the armed forces of this nation promptly and effectively for the purposes indicated if in his judgment it became necessary. It would make clear the unified and serious intentions of our Government, our Congress, and our people.

*Id.* at 210.

Since the President's inherent constitutional authority to employ military force abroad depends to a very considerable extent on the circumstances of the case, and, in particular, the extent to which such use of force is deemed essential for the preservation of American lives and property or the protection of American security interests, it is impossible to state in concrete terms the legal effect of the repeals proposed by S.J. Res. 166. Then, too, much would depend on whether Congress, by other policy statements or grants of authority, attempted to fill the gaps left by the repeals. It seems safe to conclude, however, that the repeals standing alone would not only throw into question the legal basis for certain actions the President might deem it desirable to take in the national interest, but would also demonstrate to foreign powers lack of firm national support for the carrying out of the policies set forth in the joint resolutions.

Section 2 of S.J. Res. 166 would establish a joint Senate-House committee to study the matter of terminating the national emergency proclaimed by the President on December 16, 1950 (Proclamation No. 2914, 64 Stat. A454, 3 C.F.R. 99 (1949–1953)). This proclamation of a national emergency is still in effect and as a result of the continued existence of this national emergency certain broad statutory powers are available to the President. For example, the emergency powers available under section 5(b) of the Trading with the Enemy Act (50 U.S.C. App. § 5(b)) have furnished the basis for restrictions on trade with Mainland China, the freezing of Cuban-owned assets, and the Foreign Direct Investment Program established by Executive Order 11387 of January 1, 1968, 33 Fed. Reg. 47. *See Validity of Executive Order Authorizing Program Restricting Transfers of Capital to Foreign Countries by Substantial Investors in the United States and Requiring Repatriation by Such Investors of Portions of Their Foreign Earnings and Short-Term Financial Assets Held Abroad*, 42 Op. Att'y Gen. 363 (1968).

We are doubtful that the time is ripe for a termination of the national emergency declared in 1950. However, S.J. Res. 166 provides only for a study of the question by a congressional committee, a proposal to which we have no objection and which, in any event, appears exclusively for Congress to pass upon.

Sections 3, 4 and 5 of S.J. Res. 166 are expressions of policy with regard to Vietnam and Southeast Asia. They do not involve the responsibilities of this Department, and we defer to the views of the agencies more directly concerned.

RICHARD G. KLEINDIENST
*Deputy Attorney General*